# C. A. Burr, Committee of A. E. Burr, Appellant, v. John Kase and H. Stone.

*Mortgage—Parol mortgage—Evidence—Lost paper.*

In order to convert a deed absolute on its face into a mortgage, or to create a parol secret trust as against such deed, the evidence must be clear, precise and indubitable.

In an action of ejectment it appeared that defendant, who had been a judgment creditor of plaintiff, bought plaintiff's real estate at a sheriff's sale, entered into possession and continued to occupy it for a period of twelve years, and up to the time the suit was brought.   Plaintiff claimed that defendant had agreed in writing, at the time of the sheriff's sale, to reconvey the land to him when the debt should be paid, and that the writing was lost.   He was permitted to testify to its contents.   His evidence was that the writing contained an agreement on the part of defendant to reconvey the property when the debt was paid, but he could not give the specific terms of the agreement or the amount of the debt, nor could he remember that any provision was made for taxes, repairs or other expenditures.   He did not pretend to remember the full contents of the paper. The alderman who, according to plaintiff's testimony, had prepared the paper was called, but he testified that he had only a faint recollection of

drawing some paper for the parties and he could not recall the contents. The defendant positively denied that he had ever executed any such paper. Evidence was offered and admitted however, that he had made declarations both before and after the sheriff's sale that he only wanted his money out of the property and that he intended to return the property when he got sufficient money out of it to pay his debt. It appeared from the testimony that large sums of money were spent by defendant for improvements upon the land. The evidence showed that, about a year after the sheriff's sale, the property burned down and that defendant received enough of insurance money to pay his debt, and that plaintiff then made no claim upon him to reconvey the property. *Held*, that the evidence was insufficient to entitle plaintiff to recover.

Argued March 1, 1895. Appeal, No. 298, Jan. T., 1895, by plaintiff, from judgment of C. P. Lackawanna Co., Sept. Term, 1891, No. 10, on verdict for defendants. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Ejectment for a tract of land in Carbondale township.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

" [It is necessary for you to find, before you can render a verdict for the plaintiff in this case, that H. Stone, the other defendant, had knowledge of this agreement between Dr. Burr and John Kase. If Stone was a bona fide, innocent purchaser for value of this property, without any notice, at or before the time of the purchase, of this secret arrangement between Dr. Burr and Mr. Kase, then he is not chargeable with that arrangement, and your verdict will have to be for the defendant.] " [1]

Plaintiff's points were among others as follows :

" 2. That even if H. Stone did not have notice of the agreement between Dr. Burr and John Kase, which converted the sheriff's deed into a mortgage, if the jury find that such an agreement was made before he purchased of Kase, it appearing that only a portion of the purchase money was paid, he would be entitled to protection to the extent of the money he had actually invested in the property before notice of Dr. Burr's claim, either by way of purchase money or improvements with interest thereon, and it is for the jury to find this amount from all the evidence in the case. *Answer :* This point is refused." [2]

" 7. A bona fide purchaser is entitled to protection only to the extent of the money paid before notice. Therefore H. Stone is entitled to protection in this case, even if the jury find he was an innocent purchaser for value, provided they find for the plaintiff as to the trust arrangement, only to the extent of the money he expended prior to Nov. 27, 1891, and this amount the jury is to fix upon all the evidence in the case. *Answer:* This point is refused."

Defendant's points were among others as follows:

" 3. If the jury should find from all the evidence that there was a written agreement made prior to said sheriff's sale between John Kase and A. E. Burr, by which John Kase agreed upon certain conditions to reconvey said property to A. E. Burr, and that said conditions had been fulfilled at the time suit was brought, and should further find from all the evidence that the said defendant, H. Stone, had no notice at the time or prior to his purchase of the land in question of John Kase, there can be no verdict against the defendants. *Answer:* I affirm this point." [4]

" 4. If the jury find from all the evidence in the cause that H. Stone was an innocent purchaser without notice of any equities in the plaintiff, A. E Burr, the plaintiff cannot recover, and the verdict must be for the defendants. *Answer:* If you find that H. Stone was an innocent purchaser for value and without notice, the verdict must be for the defendants. With this qualification I affirm this point." [5]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–5) above instructions, quoting them.

*A. A. Vosburg* and *Everett Warren, W. S. Hulslander* with them, for appellant.—To entitle an alleged bona fide purchaser to absolute protection free and clear of secret trusts, he must show that he paid all the purchase money before notice : Pomeroy's Equity, 751 ; Union Canal Co. v. Young, 1 Wh. 410 ; Griffiths v. Sears, 112 Pa. 530 ; Hoffman v. Strohecker, 9 W. 183 ; Boynton v. Winslow, 37 Pa. 315 ; Filby v. Miller, 25 Pa. 264 ; Deckers v. Temple, 41 Pa. 234 ; Juvenal v. Jackson, 14 Pa. 519; Coxe v. Sartwell, 21 Pa. 486 ; Youst v. Martin, 3 S. & R. 433; Bolton v. Johns, 5 Pa. 151 ; Lloyd v. Lynch, 28 Pa.

435; Rogers v. Hall, 4 Watts, 362; Merritt v. N. R. R., 12 Barb. 605.

An unrecorded defeasance changes a sheriff's deed into a mortgage: Gaines v. Brockerhoff, 136 Pa. 175; Saunders v. Gould, 134 Pa. 445; Sweetzer's App., 71 Pa. 264; Beck v. Uhrich, 13 Pa. 636.

A bona fide purchaser without notice must aver and prove not only that he had no notice of the plaintiff's rights before his purchase, but that he had actually paid the purchase money before notice: Jewett v. Palmer, 7 Johns. Ch. 65; Maccauley v. Smith, 132 N. Y. 532; Jackson v. McChesney, 7 Cow. 360; Stone v. Welling, 14 Mich. 514; Wormley v. Wormley, 8 Wheat. 450; Birdsall v. Cropsey, 45 N. W. Rep. 921; Rush v. Mitchell, 71 Iowa, 333; Wood v. Rayburn, 22 Pac. Rep. 521.

*W. W. Watson, W. S. Diehl* with him, for appellee.—A bona fide purchaser for value of the land conveyed without notice of the circumstances alleged against the validity of the title holds it discharged from equities between the parties: Pancake v. Cauffman, 114 Pa. 113; Shaw v. Read, 47 Pa. 96; Ebner v. Goundie, 5 W. & S. 49; Poth v. Anstatt, 4 W. & S. 307; Hood v. Fahnestock, 8 Watts, 489; Meehan v. Williams, 48 Pa. 238; Scott v. Gallagher, 14 S. &. R. 333; Bracken v. Miller, 4 W. & S. 102; Twyne's Case, 1 Smith's Leading Cases, 108.

OPINION BY MR. JUSTICE GREEN, May 13, 1895:

The counsel of the parties made an agreement which is printed in the Appendix, to the effect that the appellant need not print any more of the testimony than such as related " to the transaction between John Kase and H. Stone together with the charge of the court and so much of the record evidence and exhibits as the appellant may see proper to print in his paper book." It is stated in the agreement by way of recital that, " the only question raised by the assignments of error is to what extent H. Stone is entitled to protection as an innocent purchaser without notice of any equities in the plaintiff, A. E. Burr, absolutely or only to the extent of the money actually paid before notice."

If the case depended only upon the solution of that question an agreement such as the foregoing might not be subject to

objection. But in this case there is another question of far greater importance than this, the decision of which cannot be determined or even promoted by the solution of this. If the plaintiff's claim of title was of such a character that it cannot be sustained under all the evidence even against Kase, the sheriff's vendee of the title, it is only a waste of time to inquire to what extent an innocent purchaser from Kase can be protected against the plaintiff's claim. It is unfortunate that the testimony relating to the inception of Burr's claim of title was not printed in the paper-books, as it has nearly doubled our labor to discover it in a most voluminous record of 332 pages of type-written matter. After a wearisome expenditure of most precious time which we cannot afford to spare, we have reached the conclusion that the plaintiff's claim cannot be sustained in any point of view. It is grossly lacking in every element which is essential to its existence, and we could not possibly give it sanction without disregarding, and practically overruling a long line of decisions, the wisdom and justness of which have been demonstrated by a constantly recurring experience of more than half a century.

In 1879 and prior thereto the plaintiff was the owner of the surface of a small tract of land containing about twenty-five acres near Carbondale in Lackawanna county. It was incumbered with two mortgages amounting together to $3,500 and a judgment in favor of John Kase, one of the defendants. The plaintiff alleges that prior to the sheriff's sale of the property, which occurred in May, 1879, he made a written agreement with Kase whereby it was agreed that the property should be sold at sheriff's sale under Kase's judgment for $500, and that at the sale Kase should buy the property and thereafter hold it until he was repaid all his expenditure on account of the property, and when he was fully repaid he should reconvey the property to the plaintiff. The plaintiff's abstract of title contains no reference to this agreement, but in an amendment to the abstract the agreement is alleged substantially as above stated, and at the end of the amendment the plaintiff's claim is stated as follows: "That the sheriff's deed and the written agreement between A. E. Burr and John Kase formed part and parcel of the same transaction, and as the agreement was not recorded, the whole constituted an unrecorded mortgage, and was security for the said debt of $3,500."

The claim of the plaintiff, therefore, is that Kase held the title as a mortgagee only. Very often in this class of cases the attempt is made to hold the sheriff's vendee liable as trustee upon a trust arising ex maleficio. But our decisions have been perfectly uniform since Kellum v. Smith, 33 Pa. 158, decided in 1859, and indeed long before that, that a resulting trust cannot be created in that way, that " the fraud which will convert the purchaser at a sheriff's sale into a trustee ex maleficio, of the debtor, must have been fraud at the time of the sale. Subsequent covin will not answer, any more than subsequent payment of the purchase money will convert an absolute purchase into a naked trust. When the purchaser at a sheriff's sale promises to hold for the debtor, and afterwards refuses to comply with his engagement, the fraud, if any, is not at the sale, not in the promise, but in its subsequent breach. That is too late." From this decision we have never departed.

Looking now at the claim that Kase held title only as a mortgagee under an unrecorded defeasance, it will be at once perceived, that the first and indispensable requirement is that there was a written agreement duly made and executed by the parties containing the terms of the alleged contract upon which the property was sold. The sale by the sheriff was made on May 3, 1879, and on the 8th day of May following the sheriff's deed to Kase was acknowledged in open court and entered in the prothonotary's office in sheriff's deed book. It is an undisputed fact that Kase went into possession of the premises immediately after the sale and continued therein until 1886, when he sold the property to Stone, for $2,250, and Stone took possession at once and has occupied the premises ever since. This action of ejectment was brought June 1, 1891, twelve years after the sheriff's sale to Kase. On the trial the learned court below submitted to the jury two questions of fact, to wit, whether there ever was such an agreement between Burr and Kase as was claimed by Burr, and whether Stone was an innocent purchaser for value without notice. The jury found a verdict for the defendant, and presumably, they did not sustain the contention of the plaintiff upon either fact, but as it is possible they may have found for the defendant Stone because he was an innocent purchaser for value without notice, it cannot be positively assumed that they found that the agree-

ment alleged to have been made between Burr and Kase was never made.

This makes it necessary for us to review the testimony in order to learn whether we, sitting as chancellors, could determine whether the whole evidence was sufficient to change the absolute deed from the sheriff into a mortgage. The plaintiff stakes his case upon the allegation that there was an agreement in writing which established the defeasance. On the trial he did not produce any writing but said he had lost it and could not find it after diligent search. He therefore undertook to prove its contents by parol. He produced no witnesses but himself to testify to the contents, and this is his testimony on that subject: " Q. Now, Doctor, without trying to give us the exact language, I wish you would tell us the substance of this paper. A. It set forth the agreement entered into between myself and Mr. Kase in regard to this property, setting forth the facts. Q. What facts did it set forth? A. The fact that I owed him so much on this property and that all he wanted, all he ever claimed to want, was simply his money out of it, and when that was paid that the property should be reconveyed to me. Q. What if anything was said in the paper about a sheriff's sale? A. It stated the property was to go to him for the present. I forget just how it was worded. Q. I mean the substance of it. A. I cannot repeat it verbatim. I can only repeat the substance of the paper, what it was got up for. Q. Just tell the substance of it again. A. That when he received his money what was due him that was all he wanted. Q. Did the paper state what was due him? A. I think it did or about the amount. Q. Do you know what amount was stated in the paper as being due him? A. I think it was the amount of the mortgage. Q. Which was how much? A. $3,500."

This was his testimony in chief. On cross-examination he was asked: " Q. Now will you again state as near as you can what that alleged paper contained? A. Well, as I stated before, it contained an agreement between myself and Mr. Kase in regard to this property, agreed to let him have it on this note which he had paid to save costs to myself; that I was going to have the benefit of it. Q. Was this all in the paper? A. I don't know as it was; that was our agreement. Q. I am ask-

ing you what was in that paper ?   A. It was an agreement to this effect; it was an agreement that Kase gave me to satisfy me that he didn't want to take any advantage of me; that when he received what he had against that property, that it should be deeded back to me.   Q. Was that in the paper? A. Yes.   Q. That was in the paper?   A. That was in the paper; it may not have been just in these words, but in substance that is what it was drawn for, all that he wanted; he didn't want to take any advantage of me.   Q. Was that in the paper, that he didn't want to take any advantage ?   A. I don't know as it was, but when the paper was signed the paper was drawn up on that basis, so that I would have something to show.   Q. Doctor, will you tell me what was in the paper? A. Well, I was telling.   Q. I don't want you to tell outside of it.    A. Well, I will tell you as near as I can ; it was an agreement with Mr. Kase, I couldn't tell you verbatim; I can only tell you the purport of the paper ; that whenever he got what was due him that I should have the property, that he would transfer the property back to me and that the reason why it was sold the way it was, was on that paper or I wouldn't have let be sold.   Q. I want to know what was in the paper ? A. Well, I have told you.   Q. What was there about anything else ?   A. Well, I don't know, it was the usual paper drawn up by Alderman Thompson I suppose in these cases as an agreement between me and Mr. Kase that I should have the property at any time he got his money out of it, or I paid him the money.   Q. It didn't mention about anything else, any other fact ?   A. Well there may have been, I can't give you just the words of the paper.   Q. Can you tell now, Doctor, any other fact that you say was in that paper?   A. Well it mentioned something about the amount.   Q. Was he to have back his expense ?   A. There wasn't anything said about that; I don't think there was.   Q. Anything said about taxes ?   A. I don't remember anything being said about taxes.   Q. Anything about repairs?   A. I don't remember anything about repairs."

The foregoing is practically the whole of plaintiff's testimony as to the contents of the alleged agreement.   When it is considered that the effort of the plaintiff is to take away the title to land held by virtue of a sheriff's deed conveying an absolute title, by means of a lost written instrument, the only

proof of whose contents is the testimony above indicated, it
will at once be seen how utterly deficient it is in all legal re-
quirements as to that kind of testimony.   A criticism that per-
tains to the whole of it is, that it does not purport to be a
statement of the actual contents of a written instrument at all.
It does not designate a subject-matter by any kind of descrip-
tion; it does not contain the slightest attempt to repeat any of
the actual words of the instrument or even to give the mean-
ing of words actually used ; it states no terms of any kind;
it contains no statement or even description of the amount of
money which Kase was entitled to obtain before any obligation
to reconvey arose, nor does it furnish any means of determin-
ing what that amount should be ; it expressly ignores all knowl-
edge as to whether certain important matters of expenditure
were included, such as the expenses incurred by Kase, the taxes
on the property, and repairs made.   The whole of the testi-
mony leaves the subject of Kase's right of recoupment in a
state of hopeless uncertainty.   The witness has but one idea
as to the paper and that is, that in some way, or at some time,
the property was to be conveyed back to him.   In other words
the plaintiff's testimony, instead of being a statement of the
literal contents of the paper or its substance, is nothing but the
declaration of his opinion as to its legal effect.   He was to have
back the property when Kase got what was due him.   When
however he was subsequently asked what indebtedness there
was due from himself to Kase he was entirely unable to tell.
He denied that he owed anything on the $500 judgment, he
admitted that he owed him sums which he could not state, and he
made no attempt to define either the aggregate amount which
he owed, or the sums or kinds of indebtedness which Kase was
entitled to have reimbursed out of the land.   It would not be
possible for any chancellor to decree the specific performance
of such an agreement or to frame a decree which would do jus-
tice between the parties.   The evidence is entirely too meager.

As an illustration of the strictness required in proving the
contents of lost instruments the following cases are instructive.

In Dennis v. Barber, 6 S. & R. 420, an important letter was
lost.   A witness was offered who had made an extract or copy
from it, but not of the whole, and he offered to testify that the
copy or extract was all of the letter that related to the business

in question, and that the remainder of it had no connection
with that business. The offer was rejected, and this court,
GIBSON, J., said, sustaining the court below, " Mr. Levy did
not pretend that either the extract offered, or his own recollec-
tion embraced even the substance of *the whole* letter. But it is
urged that his offer to prove that the rest of it related, in no
respect, to any matter in the cause, was equivalent to proof of
the contents not comprised in the extract. A decisive answer
is, that for all this we have only the opinion of a witness who
undertakes to say what the letter did not contain, without pre-
tending to give an account of what it actually did contain ;
and although we would, in the present case, rely on Mr. Levy's
judgment with implicit confidence, yet, as every rule of evidence
must be general, we would if such evidence were competent,
often be compelled to give credit to witnesses who could not
claim anything like an equal degree of respect. There can sel-
dom be a sound construction of written evidence, without
adverting to all the parts and considering the operation of the
whole ; but the operation of the several parts on the exposition
of the whole is seldom if ever perceptible to any but a profes-
sional eye ; and the danger would therefore be that the court,
while they thought they were deciding on a view of the whole,
would be giving a garbled construction of but a part. . . .
Every day's experience must bring home to the conviction of
all men the insecurity of relying on men's recollection; and I
care not therefore how strictly the construction of written evi-
dence may be protected from the insidious influence of parol
proof. In this we have already relaxed too far." These words
of wisdom are especially applicable to this case. The plaintiff
claims that he is entitled to a reconveyance of land from the
defendant which he says is worth from twelve to fifteen thou-
sand dollars. The defendant has a sheriff's deed for an abso-
lute fee simple title to the land. The action is not brought
until after twelve years from the date of the deed, and during
every moment of that time the vendee of the sheriff and his
assignee have been in adverse possession of the land. The
plaintiff says he has lost the paper under which he claims a
reconveyance, and although he admits he made no search for it
during three years before the case was tried he was allowed to
give parol evidence of its contents. He does not pretend to

recollect the contents or any portion thereof. He gives what is really nothing but his own opinion of the meaning of the writing. He does not for a moment state upon what terms and conditions, or at what time, or in what circumstances, he was entitled to have a reconveyance under the agreement, and he admits entire ignorance as to whether certain important items of disbursement which necessarily accompanied the holding of the land were to be repaid to the grantee before he could be required to transfer the title. He cannot state the amount of his indebtedness to the grantee though he concedes that the whole of his indebtedness was to be first received by the grantee. He denies that he owed anything to the grantee on account of the judgment of $500 which the grantee held against him, and he admits that he owed the grantee other sums of money the amounts of which he is unable to state. On what possible basis could a reconveyance be ordered by a court without having, first, full knowledge of the precise terms of the agreement of defeasance, and second without knowing the exact amount of the indebtedness which the plaintiff owed to Kase for which the latter was entitled to be reimbursed. It is simply and utterly impossible to make any such decree in such a state of the proof.

In McCredy v. The Schuylkill Nav. Co., 3 Whart. 424, we held that evidence of the contents of an instrument alleged to have been lost cannot be given without previous proof of its due execution which includes proof of its delivery; and where a witness called to prove the former existence of an instrument, testified that it had been put into the hands of A as an escrow, and A on his examination testified that he could not recollect on what occasion, or with certainty, to whom it was given up, and that he should not have given it up without the consent of both parties, it was held, that evidence of the contents of the instrument was properly rejected.

In Kerns v. Swope, 2 Watts, 75, GIBSON, C. J., said, " The rule of law which requires the best evidence to be produced is nowhere more rigidly enforced than in proving the contents of a lost deed. There are but two ways of doing this in the circumstances of the present case. Before a copy can go to the jury it must be proved to be such by one who compared it with the original; and it is even then inadmissible if there be a counterpart."

In Coxe v. England, 65 Pa. 212, AGNEW, J., said, speaking
of a witness who was offered to prove the contents of a lost
letter, " She cannot say that she remembered any sentences of
the letter word for word as they were written or read aloud.
Her account evidently shows a hasty glance only at the letter,
while the true source of her recollection was the utterance of
her husband. . . . In addition to this she does not profess to
give the whole contents and does not even state that this por-
tion of the letter was all that related to the subject of the tim-
ber.   On this point her testimony falls far short of the evidence
of the contents offered in Dennis v. Barber, 6 S. & R. 420, a
case which rules this in respect to the proof of contents."

We hold that the proof of contents in this case was altogether
short of the requirements of the law, and that it cannot be con-
sidered as sufficient to establish any right of recovery in the
plaintiff as upon an agreement in writing.   The plaintiff ad-
mitted on the trial that he had made no search for the paper
within three years before the trial, and, in our opinion, the of-
fered proof of contents should not have been received for that
reason.

But there is a still more important objection to the validity
of the claim, and that is the want of sufficient proof that there
ever was such an agreement.   The plaintiff testified that the
agreement was written by an alderman named J. G. Thompson
living in Carbondale, and that he attested it as a witness and
took the acknowledgment of the parties to it.   The alderman
was called as a witness by the plaintiff, but he entirely failed
to establish either the preparation or the execution of such a
paper.   After stating that he knew both Dr. Burr and John
Kase he was asked: " Q. Did you do any business for them
about 1879 ?   A. Yes.   Q. Do you remember drawing any
paper between them relating to the cottage property in 1879
in the spring ?   A. Well, I cannot recollect anything very par-
ticular about it.   I have some recollection of drawing some
paper, a faint recollection of drawing some paper for Mr. Kase
and Mr. Burr.   Q. Can you give us the contents of that paper
at this time ?   A. I cannot."   The remainder of his testimony
was no improvement upon the foregoing.   No other testimony
was offered by the plaintiff as to the execution of any written
agreement between Burr and Kase.

When Kase was called as a witness on his own behalf, he denied in the most positive and emphatic manner that he ever made any written agreement, or any other agreement, with Burr for the purchase of the property and the reconveyance of it, as alleged by Burr. After saying that Alderman Thompson never drew any paper between him and Burr relating to this property he was asked: "Q. State whether or not you ever signed any paper? A. No, I never did. Q. Whether you ever signed any paper agreeing in any way to reconvey this property upon any conditions whatever to Dr. Burr? A. No, I never did. Q. State whether at any time before, at the time or since the sheriff's sale you ever made any agreement in any way to reconvey this property to Dr. Burr upon any condition? A. Not any. Q. State whether Dr. Burr ever demanded of you to make any conveyance of this property to him? A. No, he never did."

His subsequent testimony made no change in the foregoing. So far then as the making of an agreement in writing is concerned the case stands upon the testimony of Burr on the one side and Kase on the other. There was some attempt made on the part of the plaintiff, as is usual in this class of litigations, to show admissions in conversations by Kase of having made some kind of agreement with Burr to reconvey. Mrs. Catharine Lee was one of these witnesses, and she said: "I heard Mr. Kase and my husband talking about the cottage property at that time. Mr. Kase as I understood it wanted to get his share out of the property. It is so long ago that I can hardly remember the conversation fully. That is all he wanted, to get his share out of it, or something like that." As this would be entirely consistent with the idea that Kase wanted to get his money back by a sale of the property as his own, and as nothing was said about any reconveyance of the property to Burr, the testimony was absolutely useless in support of the plaintiff's claim.

M. B. Simrell, a witness for the plaintiff, testified to a conversation with Kase which occurred in 1879, fifteen years before the time when he testified. After saying that he was at Kase's store and was talking with Kase about the property he was asked: "Q. Tell us what the conversation was? A. I asked him if it was going to take all Mr. Burr had to satisfy

this judgment, and he says, 'Oh, no! he will be left all right.' And I says, 'How is this?' 'Well,' he says, 'I have got some money involved there, and when I get my money out I am satisfied and shall return the property to him.' Q. What else? A. And I says, 'How is this, has he got any bonds for that?' and he says, 'He has got a paper to protect him.' Q. Is that all the conversation? A. I think that is the sum and substance of it that day." On cross-examination he gave this version of the same conversation : " Q. What was said next? A. I said, ' How is it, you have got him advertised and you are going to sell him out by the sheriff,' and he said, 'That is all right.' I said, 'Aint that going to ruin him, aint that going to take all he has got?' He said, ' He has enough there to pay me, and after I get that that is all I want.' Q. Was there any thing else said; do you remember any thing more that was said about this? A. Nothing particular."

The discrepancy between the testimony of this witness in chief, and on cross-examination, is enough to condemn it for any purpose in a case of this kind, where the whole fate of the case depends upon clear, precise and indubitable testimony to the very matter in controversy, without considering its lack of detail as to most essential matters, or the fact that the defendant positively denied the whole conversation. On his examination in chief he simply said that Kase said, " when I get my money out I am satisfied and shall return the property to him." This of course means no more than a simple declaration to a stranger of an intention that when he got his money out he should return the property to Burr. He does not say that he had made any contract to reconvey but simply that he would reconvey. In other words he had the intention to reconvey, which of course he might change at any moment. Dr. Burr was not present and therefore it was not in any degree the expression of a contract to reconvey. Then the witness, in reply to the next question, said, " He has got a paper to protect him." What kind of a paper ? The witness does not say. Was it a bond of indemnity, or an agreement to hold the property in trust and ultimately, if either Burr should pay the debt he owed Kase, or Kase should recoup himself out of the proceeds of the property, that would protect him? And what money was Kase to get out of the property? Was it all

the debts Burr owed him, or only the liens on the property, and was it to include expenditures for taxes, repairs, expenses and costs? The witness says nothing as to any of these particulars. But in his cross-examination the witness says nothing about any agreement to reconvey or any paper that would "protect him," and the question is which version is correct. It is a sufficient reply to the whole of this that it is too indefinite, too uncertain and too contradictory for any court to rely upon as the basis of a decree.

The only other witness to conversations is Philo Lee, and this is his testimony: " I and Mr. Kase got talking, and I asked Mr. Kase how he and Mr. Burr was getting along; he said he thought they would get along all right, that all he wanted, he says, was to get what belonged to him, if he gets that he would be perfectly satisfied." There is nothing here of any agreement to reconvey or any intent to do so, and as to getting what belonged to him it is altogether consistent with getting his money by means of a sale on his own account. This is all the testimony in the case on the part of the plaintiff upon this subject, and it is so lamentably short of the kind of testimony required for such a case, that it will only be necessary to state the rule which has been established for quite half a century in this commonwealth, to make out a right of recovery in this class of cases.

The cases in which it is held that in order to convert a deed absolute on its face into a mortgage, or to create a parol secret trust as against such a deed, the evidence must be clear, precise and indubitable, are so numerous, and the profession is so familiar with them, that only a brief reference to a few of them will be necessary.

In the case of Fisher v. Witham, 132 Pa. 488, we said, " While a deed absolute on its face, executed prior to the act of 1881, may be converted into a mortgage by parol proof, it is well settled that the evidence must be clear, explicit and unequivocal. It must show an agreement in the nature of a defeasance, contemporaneous with the execution and delivery of the deed. Subsequent admissions alone are not sufficient. The evidence in this stale case falls far below the required standard, and we therefore think the court below was clearly right in sustaining exceptions to the master's report and dismissing the bill."

In Rankin v. Simpson, 19 Pa. 471, Mr. Justice WOODWARD, commenting upon this class of cases said, " If a party call on courts to execute parol contracts for land in spite of the statute of frauds and perjuries, let him prove a contract. Because he can find persons who remember the owner's loose or casual declarations indicative of a sale, shall he have a decree in disregard of the statute and in opposition to his own declared convictions? The chancellor has never lived who would tolerate such a demand. Patents and deeds and wills would be a solemn mockery if they might be trifled with and set aside in this manner."

In Nicolls v. McDonald, 101 Pa. 514, we said, " When a party sets up a title against a deed absolute in its terms and seeks to convert it into a mortgage the proof of the alleged agreement necessary to change its character must be clear, explicit and unequivocal. It should not rest on the subsequent admissions and declarations of the alleged mortgagee only." . . . " When the attempt is made he claims as a mortgagor seeking to redeem. Although the action may be ejectment in form, yet in substance it is a bill in equity to compel a reconveyance of the land from the mortgagee in possession. . . . If the parol evidence be insufficient to move a chancellor to decree a reconveyance, it is insufficient to justify a recovery in ejectment. . . . If he be of opinion that the evidence does not make out a case which would induce a chancellor to decree a conveyance, it is his duty to give the jury binding instructions to that effect."

To show by parol that a deed absolute on its face is a mortgage the proof must be clear, explicit and unequivocal: Plumer v. Guthrie, 76 Pa. 441.

To convert a deed absolute on its face into a mortgage by parol evidence it must be clear, precise and indubitable, sufficient to satisfy the mind of a chancellor, otherwise it is error to submit it to the jury: Pancake v. Cauffman, 114 Pa. 113; Rowand v. Finney, 96 Pa. 192; Saunders v. Gould, 134 Pa. 445.

It is unnecessary to multiply the citations. Applying the principle to the present case it is seen at once that the plaintiff's claim is destitute of merit. His oath is met by the contrary oath of the defendant Kase. If we look for corroborating circumstances they are absent, but they are present against his claim with great force. For instance in the very next year after

Kase received his sheriff's deed some of the buildings on the premises took fire and were burned to the ground. Kase received almost $4,000 of insurance money and according to the plaintiff's theory Kase was thereby fully paid all the money that was due him. Yet the plaintiff took no steps to enforce his equity. If he held a written agreement such as he alleges, then was the time to present his demand, and if refused, to take immediate 'steps to enforce it. Then everything was fresh in the memory of parties and witnesses, the written agreement was in the plaintiff's possession according to his statement, and his remedy was simple and easy. It is absolutely inexplicable why he did not do this, and no explanation worth speaking of is attempted. He stood by and did nothing. Finally Kase, being in possession constantly for seven years, sold the property to Stone, who was undoubtedly an innocent purchaser for value without notice. Stone took possession at once and spent some $1,500 in improvements, according to the testimony. Meanwhile Burr gave him no notice of his claim of title but allowed the improvements to be made without any objection or demand, or offer of indemnity. It is simply impossible to reconcile such conduct with the integrity of the plaintiff's claim. At last after delaying all efforts to assert his title for twelve years he brings the present action without making any demand upon Stone, or giving any notice of his title, or making any offer to pay him the money he had expended. This is gross laches which is fatal to any claim in an equitable proceeding.

In our opinion no chancellor would decree a conveyance in such circumstances as these and therefore we hold that Burr cannot recover either against Kase or Stone.

The assignments of error are all dismissed.

Judgment affirmed.